

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00348-CV

_____

IN THE INTEREST OF A.H. AND K.H., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-690431-20

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

In this appeal, Appellant M.H. (Mother) appeals the trial court's order terminating her parental rights to her children A.H. (Alexa) and K.H. (Kyle).[1] The trial court found that the Department of Family and Protective Services (the Department) had proved two conduct-based grounds for termination against Mother and that termination of her parental rights was in Alexa's and Kyle's best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). In her sole issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest findings. Because legally and factually sufficient evidence supports the trial court's best-interest findings, we will affirm the trial court's termination order.

## II. BACKGROUND

### A. Alexa's and Kyle's Births, Their Removal and Placement in a General Residential Operation, and the Department's Involvement

Alexa was born in April 2018. In November 2018, the Department filed a petition seeking the termination of Mother's parental rights to Alexa and to Alexa's two older siblings, A.D.H. (Anthony) and A.T.H. (Aaron). That same month, the Department removed Alexa, Anthony, and Aaron from Mother's care.[2] Around that

---

[1]To protect their identities, we use aliases to refer to the children and their family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]At the termination hearing, no one testified as to the reason for the Department's removal of Alexa, Anthony, and Aaron. The affidavit in support of

2

time, Alexa was placed in a general residential operation (GRO) with Anthony and Aaron.

Kyle was born in May 2019. In August 2019, the Department filed an amended petition in which it also sought termination of Mother's parental rights to Kyle. That same month, the Department removed Kyle from Mother's care and placed him in the same GRO as Alexa, Anthony, and Aaron.[3] In October 2020, the case involving Anthony and Aaron was severed from the case involving Alexa and Kyle. Around that same time, the Department placed Anthony and Aaron with an aunt.

The Department's plan for Alexa and Kyle was family reunification. To that end, the Department filed a motion for monitored return of Alexa and Kyle in February 2021; the trial court granted the motion. Incidents that occurred in February and April 2021, however, derailed the Department's plan for reunification. Aaron made an outcry that during an unsupervised visit with Mother, she had been driving while intoxicated and had fallen asleep while in a drive-through. Aaron also

---

removal—which contains reasons for the removal—was not admitted at the termination hearing, and we may not consider it as evidence. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 790 n.2 (Tex. App.—Austin 2023, no pet.) ("A copy of the removal affidavit was not admitted into evidence during trial, and because it was not admitted, we cannot consider the allegations contained within the affidavit in our review of the evidence.").

[3]At the termination hearing, no one testified as to the reason for Kyle's removal from Mother's care.

indicated that during a weekend stay with Mother, the children had only been fed once. During another incident, Mother's vehicle crashed into a gate while she was picking up Anthony from school; Mother left Anthony at the school while she went to have her vehicle looked at, leaving him at the school until evening.[4] Due to these incidents, the Department filed a motion to end the monitored return, and the trial court signed an order ending the monitored return in May 2021. In June 2021, the trial court appointed the Department permanent managing conservator of Alexa and Kyle without terminating Mother's parental rights.

## B. Mother's History of Drug Use, Her Attempts to Complete Services, and Her Continued Drug Use and Failure to Submit to Drug Testing

Demetria Jackson, a permanency specialist[5] employed by Our Community Our Kids (OCOK),[6] was assigned to the case from December 2019 until September 2022. During the termination trial, Jackson testified that Mother had a lengthy drug history—"20-plus years"—and that during that history, Mother's drugs of choice had been cocaine, marijuana, and methamphetamine. The Department requested that

---

[4]A witness at the termination hearing testified that "there were concerns that [Mother] was intoxicated" during this incident.

[5]At the time of the termination trial, Jackson was no longer a permanency specialist.

[6]As our court has explained, "OCOK is a private provider of community-based care that contracts with the Department to provide 'foster[-]care case management, kinship, and family reunification services' in parts of the state, including Tarrant County." *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pet. denied) (mem. op.).

Mother complete certain services to help her with her drug problems and to help her become a better parent. Jackson testified that Mother had completed the majority of the services requested by the Department, including completing multiple drug-and-alcohol assessments, outpatient services, counseling, parenting classes, and FOCUS for Mothers classes. Jackson also stated that Mother had participated in the majority of her visits with Alexa and Kyle and that Mother was appropriate during those visits.

While Mother completed a majority of her services, her problems with drugs and alcohol remained. In November 2020, the urine sample that Mother submitted for drug testing was outside of the temperature range required for the test. In 2021—while Mother was receiving outpatient treatment for her drug-and-alcohol problems—she had "slipup[s]" where she used cocaine and alcohol. Mother also told Jackson that she had relapsed in June or July 2022, admitting to using cocaine and opiates. Moreover, Jackson testified that Mother did not comply with requested drug tests in July and August 2022. Mother told Jackson that she could not take these tests because she was busy working. Jackson had been to Mother's place of employment on a day that Mother had indicated she was working, and Jackson was told that Mother was not at work. When Jackson confronted Mother with that fact, Mother became "very upset." Jackson stated that later that month, Mother tested "positive for drugs."[7] When confronted about one of her relapses, Mother told Jackson that

---

[7]The specific drug that yielded a positive test result on this occasion is unclear from Jackson's testimony.

she had relapsed because "she had a lot going on, and there w[ere] a lot of deaths in her family."

K.H. (Father)[8] had his own drug problems, and Mother continued her relationship with him following Alexa's and Kyle's removals. Jackson stated that Father had tested positive for marijuana and methamphetamine during the Department's involvement in the case. When approached about those results, Father explained that he had tested positive because he was "dealing drugs and also . . . around people that used drugs." Father later stopped submitting to the drug tests requested by the Department. Mother admitted to Jackson that she was still in a relationship with Father, noting that they were still married and that she did not believe in divorce. Jackson stated that Mother and Father had arrived at visits in the same vehicle and that she had seen Father's vehicle at Mother's home when she had made unannounced visits to the home.

Rochelia Jenkins, a permanency specialist with OCOK, was assigned the case from September 2022 until June 2023.[9] Jenkins testified that when she received the case, Mother was not engaging in services because she did not think that she would get Alexa and Kyle back. Jenkins requested drug tests from Mother every month that

---

[8]The trial court terminated Father's parental rights to Alexa and Kyle in the same order in which it terminated Mother's parental rights. Father did not appeal.

[9]At the time of the termination trial, Jenkins was no longer employed with OCOK.

Jenkins was assigned to the case, but Mother did not comply with any of Jenkins's requests. Mother told Jenkins that she was not taking the drug tests; she explained that "they would be positive because there's a lot of stressful things going on in her life[] and [that drugs] numb[ed] the pain." Mother indicated that the tests would be positive for cocaine and marijuana. Jenkins suggested that Mother complete another drug assessment; Mother, however, never followed up regarding that drug assessment. In January 2023, Mother also admitted to Jenkins that she was pregnant and that she had used cocaine and marijuana the previous week.

Kamisha Knight, a permanency specialist employed by OCOK, was assigned the case after Jenkins left OCOK in June 2023. Knight testified that Mother had not complied with any requested drug screenings since Knight was assigned the case, noting that Mother had not submitted to a requested drug test since September 2022. Knight stated that Mother had wanted to participate in services from an organization called Recovery Resource, and Knight had told Mother that she needed to submit to drug testing in order to get into the Recovery Resource program. Despite that conversation, Mother still did not submit to drug testing. Knight also testified that Mother had missed three visits with Alexa and Kyle in the short time that Knight had been assigned the case. Mother told Knight that she had missed two of the visits

7

because "it was too hot to go to Weatherford" and that she had missed the other visit because "she didn't have anybody to sit with her grandmother."[10]

## C. The Department's Attempts to Place Alexa and Kyle, Alexa's and Kyle's Stays at the GRO, and the Department's Plans for Alexa and Kyle

Throughout the Department's case,[11] both Mother and Father offered numerous potential placements for Alexa and Kyle. The Department investigated these potential placement options to no avail. The aunt who was caring for Anthony and Aaron was not interested in taking Alexa and Kyle. Alexa and Kyle's paternal grandmother was also considered as a placement option, but she had health concerns and later asked the Department to stop contacting her. One of Father's cousins was also considered as a placement option. The Department did two home studies on the cousin, and the cousin had unsupervised visits with Alexa and Kyle to prepare them for placement. The cousin, however, twice backed out of caring for Alexa and Kyle, started failing to pick them up for visits, and eventually stopped taking phone calls from the Department's caseworkers.

A woman who worked for the entity associated with Alexa and Kyle's GRO was also considered. While that woman was initially a viable placement option, the

---

[10]Knight stated that Mother was the sole caregiver for her grandmother.

[11]As noted below, although Alexa and Kyle have been in the Department's care for approximately five years and various petitions to terminate Mother's and Father's parental rights were filed, the petition involved in this appeal was filed in January 2023.

Department attempted to exhaust placement options with Alexa and Kyle's family members before considering the woman. When the family options did not pan out, the Department reached out again to the woman, but she was no longer interested. The Department also considered as placement options numerous friends and acquaintances suggested by Mother and Father, but those placement options failed for a variety of reasons. All potential placement options were exhausted by the Department, with none of them coming to fruition. Thus, Alexa and Kyle have remained at the GRO.

As to Alexa's and Kyle's stays at the GRO, Jackson stated that there were twenty to thirty homes in their GRO community. Jackson described the GRO as "kind of like a group home setting" and "basically like a regular home setting or a foster home setting." Jackson indicated that "there's normally . . . four to six other kids" in the home with Alexa and Kyle, and she stated that Alexa and Kyle each have their own room and bathroom. Knight testified that both Alexa and Kyle were doing well in the GRO placement, and Jenkins indicated that the GRO had been a consistent placement for them. Nevertheless, Jackson testified that a GRO is not a "long-term placement" for children and that it is not in the best interest of a child to stay at a GRO "forever." Jackson also stated that the GRO is not allowed to adopt children. Knight testified that the Department's plans were for Alexa and Kyle to ultimately be adopted following termination, noting that the Department planned to list Alexa and Kyle on the Texas Adoption Resource Exchange.

9

## D. Procedural History

In January 2023, the Department filed its latest petition seeking termination of Mother's parental rights as to Alexa and Kyle based on, among other things, the predicate termination grounds set forth in Subsections (D) and (E) of Section 161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). The case proceeded to a bench trial in September 2023. At trial, Jackson, Jenkins, and Knight testified for the Department. Mother called no witnesses.[12] At the conclusion of the trial, the trial court signed an order finding that Mother had engaged in conduct under Subsections (D) and (E) and that termination of her parental rights was in Alexa's and Kyle's best interests.

Mother later filed a motion for new trial. As best as we can glean,[13] the thrust of that motion was that the trial court should have considered in making its best-interest findings the danger to children that is posed by the foster-care system in Texas, and that when considering such factor here, the evidence was insufficient to support the trial court's best-interest findings. At a November 2023 hearing on

_____

[12]Neither Mother nor Father appeared at trial. Knight testified that she had spoken to Mother on the day of trial and that Mother had told Knight that she could not attend because she was at home taking care of her grandmother and had no one else to assume those caregiving responsibilities. Mother's trial counsel asked for a continuance at the beginning of trial. The trial court denied that request. No argument is raised on appeal regarding the trial court's denial of Mother's request for a continuance.

[13]Mother's motion for new trial is not part of the appellate record.

10

Mother's motion for new trial, Mother's counsel offered into evidence and the trial court admitted the Fifth Circuit's 2018 opinion in *M.D. by Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018). Mother's counsel also offered into evidence and the trial court admitted a "Fifth Report of the Monitors" that had been filed in the *Stukenberg* litigation in January 2023.[14] Finally, Mother's counsel called Jackson as a witness. Jackson testified that Alexa had been in the GRO since November 2018 and that Kyle had been in the GRO since August 2019. At the conclusion of the hearing, the trial court denied Mother's motion for new trial.

## III. DISCUSSION

### A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under

---

[14]In the *Stukenberg* litigation, a certified class of minor children in the permanent managing conservatorship of the Department sought certain injunctive relief, alleging that "the State's maintenance of its foster[-]care system [had] expose[d] them to a serious risk of abuse, neglect, and harm to their physical and psychological well-being." 907 F.3d at 243. A federal district court held that "the State's policies and practices [had] violated plaintiffs' constitutional right to be free from an unreasonable risk of harm[] and granted plaintiffs a permanent injunction requiring sweeping changes to Texas's foster[-]care system." *Id.* The district court appointed certain monitors to assess and report on compliance with the injunction. *See id.* at 247. The "Fifth Report of the Monitors" admitted at the hearing on Mother's motion for new trial is one such report, consisting of a 155-page lead document and over 100 pages in appendices.

Section 161.001(b)(2).[15]  Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings—here the best-interest findings—to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2).  We assume that the factfinder settled any evidentiary conflicts in favor of its findings if a reasonable factfinder could have done so.  *J.P.B.*, 180 S.W.3d at 573.  We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the findings.  *Id.*  That is, we consider evidence favorable to the findings if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.  *See id.*  The factfinder is the sole judge of the witnesses' credibility and demeanor.  *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

---

[15]Mother does not challenge the predicate-ground findings.

12

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of Mother's parental rights to Alexa and Kyle is in their best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(2). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002).

## B. Applicable Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;
- the child's emotional and physical needs now and in the future;

13

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.).

## C. Best-Interest Analysis

As to Alexa's and Kyle's desires, the record reflects that Alexa was five years old at the time of the termination trial and that Kyle was four years old. Neither of

them testified at trial. "Generally, when children are too young to express their desires, this factor is considered neutral." *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g). This factor weighs neither in favor of nor against the trial court's best-interest findings. *See id.*; *In re A.M.C.*, No. 07-18-00099-CV, 2018 WL 3521382, at *4 (Tex. App.—Amarillo July 20, 2018, no pet.) (mem. op.) (holding that this factor weighed neither for nor against termination because children were five and four at time of trial).

As to the emotional and physical needs of Alexa and Kyle now and in the future and the emotional and physical danger to them now and in the future, the record reflects that Mother has a lengthy history of drug use, including use after the Department removed Alexa and Kyle. Jackson testified that Mother had admitted to using cocaine in 2021 and that she had admitted to using cocaine and opiates in 2022. Jackson also testified that Mother did not submit to requested drug tests in July and August 2022, and Jackson further testified that one of Mother's submitted drug tests in 2020 was outside of the temperature range required for the test. Jenkins testified that Mother admitted that she had used cocaine and marijuana as recently as January 2023, at a time when Mother was ostensibly pregnant. Jenkins also stated that she had requested drug tests from Mother every month during the September 2022 through June 2023 time period that Jenkins was assigned the case but that Mother did not comply with any of Jenkins's requests. Knight testified that Mother had not

15

complied with any requested drug testing in the couple of months that Knight had the case before trial.

Such evidence of past drug use and a refusal to submit to drug testing supports a finding that the parent has endangered the child's emotional and physical needs and poses a danger to the child. *See In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *7 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.) (conducting best-interest analysis and noting that mother's pattern of drug use and refusal to submit to drug testing supported termination); *In re M.H.*, No. 02-22-00048-CV, 2022 WL 2840266, at *2–3, *6 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.) (similar). As to future drug use, a factfinder may measure a parent's future conduct by her past conduct. *In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *11 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.); *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.). And as to Mother's continued relationship with Father—a man who had tested positive for marijuana and methamphetamine during the Department's case and who had admitted to dealing drugs and being around drug users—the factfinder could have found that the continued relationship demonstrated Mother's inability to perceive the danger of parental drug use. *See In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) (holding that father's concealment of drug use and continued relationship with mother who had abused drugs demonstrated his inability to perceive danger

16

posed by parental drug use). The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Alexa and Kyle.

As to Mother's parental abilities and as to the programs available to assist her in promoting Alexa's and Kyle's best interests, the record reflects that Mother completed the majority of the services requested by the Department, including multiple drug-and-alcohol assessments, outpatient services, counseling, parenting classes, and FOCUS for Mothers classes. Despite the completion of those services, Mother's drug-and-alcohol problems remained. Indeed, some of Mother's relapses occurred while she was participating in outpatient programs. Other incidents involving alcohol occurred shortly after Mother obtained an order for a monitored return. Particularly damning is Mother's admission that she had used marijuana and cocaine while ostensibly pregnant in January 2023, as is her failure to comply with drug testing in the second half of 2022 and throughout 2023. And, finally, while Mother expressed a willingness to participate in services from Recovery Resource in the months before trial, she failed to submit to drug testing that was a prerequisite for acceptance in the program. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Alexa and Kyle.[16] *See In re*

_____

[16]The trial court could have also found that Mother's failure to appear at the termination trial demonstrated a lack of motivation to parent Alexa and Kyle. *See In re K.G.-J.W.*, No. 01-17-00739-CV, 2018 WL 1161556, at *10 (Tex. App.—Houston [1st Dist.] Mar. 6, 2018, pet. denied) (mem. op.) ("And the record shows that Mother was aware of the trial date but nonetheless failed to appear; thus, demonstrating a lack of motivation to be K.W.'s parent."); *In re J.E.*, No. 14-16-00850-CV, 2017 WL 1274081,

*D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *13 (Tex. App.—Fort Worth Dec. 22, 2022, pet. denied) (mem. op.) ("Although evidence showed that Mother had completed some steps of the service plan, her missed drug tests, failed drug tests, [and] excuses to delay tests . . . could have led the trial court to find that Mother had gone through the motions in completing her service plan but had not made lasting changes to benefit her children."); *In re D.L.S.*, No. 10-11-00033-CV, 2011 WL 2480439, at *4 (Tex. App.—Waco June 22, 2011, no pet.) (mem. op.) ("Evidence of a parent's drug addiction . . . can show a lack of parental abilities.").

As to the plans for Alexa and Kyle and the stability of the home or proposed placement, the record reflects that Alexa had been in the GRO since November 2018 and that Kyle had been in the GRO since August 2019. Knight testified that both Alexa and Kyle were doing well in the GRO. Jackson noted that the GRO is not a "long-term placement" for children and that it is not in the best interest of a child to stay at a GRO "forever." The Department, however, did not plan on keeping Alexa and Kyle at the GRO permanently.[17] To that end, Knight testified that the Department intended for Alexa and Kyle to be adopted following termination, noting

at *7 (Tex. App.—Houston [14th Dist.] Apr. 4, 2017, pet. denied) (mem. op.) (holding that parent's failure to appear at termination trial was indicative of an unwillingness to parent and was supportive of best-interest finding).

[17]The record reflects that the Department made significant efforts to place Alexa and Kyle with family members and others suggested by Mother and Father. The Department exhausted all potential placement options to no avail; thus, Alexa and Kyle have remained in the GRO.

that the Department planned to list Alexa and Kyle on the Texas Adoption Resource Exchange.

On appeal, Mother suggests that in evaluating the *Holley* factors, the trial court should have also considered "the fact that group foster placement poses an existential threat to the children of Texas."  According to Mother, the trial court did not take that consideration into account, and therefore, her right to due process was violated.[18] But there is nothing in the record to indicate that the trial court did not consider Mother's concerns with the GRO placement in analyzing the *Holley* factors.  Indeed, the trial court heard at the motion for new trial hearing the arguments Mother now makes on appeal, and it allowed Mother to present evidence in support of her arguments.

---

[18]In her brief, Mother also argues that the best-interest prong has become "meaningless" because predicate-ground conduct can be considered in analyzing best interest and because undisputed evidence of just one of the *Holley* factors may be sufficient to support a finding that termination is in a child's best interest.  We reject Mother's arguments, noting that the Texas Supreme Court allows us to consider predicate-ground conduct in making our best-interest analysis and allows us to affirm a trial court's best-interest finding if there is undisputed evidence of just one of the *Holley* factors.  *See E.C.R.*, 402 S.W.3d at 249 (providing that same evidence may be probative of both Section 161.001(1) and best-interest grounds); *C.H.*, 89 S.W.3d at 27 ("But we have never held that [the *Holley* factors] are exhaustive, or that *all* such considerations must be proved as a condition precedent to parental termination.  The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.").

19

The trial court may have simply found Mother's arguments to be unavailing. And it would have been justified in doing so. The issues with the Texas foster-care system that Mother raises—issues highlighted by the *Stukenberg* litigation and the "Fifth Report of the Monitors" in that litigation—speak *generally* to problems in the Texas foster-care system; they say nothing *specifically* about Alexa, Kyle, or the GRO where they are placed. Moreover, the Fifth Circuit held that the injunction ordered by the district court in that litigation was "significantly overbroad," and it ordered the district court to remove certain injunction provisions related to family group homes. *Stukenberg*, 907 F.3d at 271. The court stated that the district court's analysis contained a "critical causal flaw," noting that "[t]he district court [did] not . . . identify how mixing ages, sexes, and service levels in [family group homes] is significantly different from doing so in foster family homes." *Id.* at 270. The Fifth Circuit noted that family group homes "are a critical placement option for large sibling groups [that the Department] is attempting to keep together." *Id.* It held that while "there may be risks to combining children with different needs in a single living space, doing so is not *per se* unconstitutional—all states do so in a variety of different settings in a way that avoids violating children's rights." *Id.*

Here, the evidence before the trial court was that Alexa and Kyle were doing well at the GRO and that the Department desired for Alexa and Kyle to be adopted following termination of Mother's parental rights. No evidence was presented regarding Mother's plans for Alexa and Kyle. The trial court was entitled to find that

20

these factors weighed in favor of terminating Mother's parental rights to Alexa and Kyle. *See In re G.C.*, No. 14-18-01114-CV, 2019 WL 2063038, at *9 (Tex. App.—Houston [14th Dist.] May 9, 2019, pet. denied) (mem. op.) ("Evidence about placement plans and adoption are, of course, relevant to the child's best interest. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest regularly would be subject to reversal on the sole ground that an adoptive family has yet to be located." (citation omitted)).

As to Mother's acts or omissions that may indicate that the existing parent–child relationship is not a proper one and as for Mother's excuses, if any, for such acts or omissions, the record reflects that Mother admitted to using alcohol and drugs—including cocaine, marijuana, and opiates—following removal. Mother's offered explanations for these relapses included that her life was stressful, that the use of drugs and alcohol helped "numb[] the pain," that "she had a lot going on," and that "there w[ere] a lot of deaths in her family." None of those excuses justifies illegal drug use or abuse of alcohol. Moreover, Mother offered no excuse for refusing to submit to drug testing during the second half of 2022 and throughout 2023, apart from telling Jackson that she was busy at work on a day that she was not working and that she had failed to take the tests because they would be positive for drugs. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Alexa and Kyle. *See In re D.R.V.*, No. 08-22-00238-CV,

21

2023 WL 2544577, at *8 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.) (holding that mother's failure to offer any explanation for noncompliance with random drug testing was a factor that trial court could have considered in favor of termination as part of best-interest determination).

## D. Best-Interest Conclusion

Viewing the evidence in the light most favorable to the trial court's best-interest findings, we hold that a factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and Alexa and Kyle was in their best interests, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is also factually sufficient to support the trial court's best-interest findings. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's sole issue.

## IV. CONCLUSION

Having overruled Mother's sole issue, we affirm the trial court's termination order.

/s/ Dana Womack
Dana Womack
Justice

Delivered: January 18, 2024

22